**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CHARLES FREDERICK CASTLE,**

**Plaintiff,**

**vs.**                                                                    **CIVIL ACTION NO. 2:16-01118**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. By Standing Order entered February 1, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 14.)

The Plaintiff, Charles Frederick Castle (hereinafter referred to as "Claimant"), protectively filed his applications for Title II and Title XVI benefits on April 10, 2012 (Tr. at 238, 239-244, 245-251.), alleging disability since July 15, 2011 due to high blood pressure, injuries from a four-wheeler accident, left knee injury and arthritis, anger and nerve issues, and a learning disability. (Tr. at 239, 245, 269.) His claims were denied initially on August 13, 2012 (Tr. at 134-146.), and upon reconsideration on October 18, 2012. (Tr. at 148-154, 155-161.) Thereafter, Claimant filed a

1

written request for hearing on November 15, 2012. (Tr. at 162-163.) An administrative hearing was held on October 24, 2013 before Administrative Law Judge ("ALJ") Stanley Petraschuk in Charleston, West Virginia. (Tr. at 70-76.) No testimony was taken, and the hearing was continued as the ALJ ordered physical and psychological consultative examinations. (Tr. at 75.) On June 17, 2014 a supplemental hearing was held before ALJ John T. Molleur in Charleston, West Virginia. (Tr. at 35-69.) The ALJ heard the testimonies of Claimant (Tr. at 41-53.), Medical Expert ("ME") George S. Bell, M.D. (Tr. at 53-60.), and Vocational Expert ("VE") Olen J. Dodd. (Tr. at 61-67.) On June 24, 2014, the ALJ entered a decision denying benefits. (Tr. at 10-34.)

The ALJ's decision became the final decision of the Commissioner on October 16, 2015 when the Appeals Council denied Claimant's Request for Review. (Tr. at 5-8.) Claimant filed a request for extension to file a complaint in district court on December 14, 2015 (Tr. at 3-4.), which was approved by the Appeals Council on January 13, 2016. (Tr. at 1- 2.) On January 29, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2015). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under

the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2015). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those

sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant had met the requirements for

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

insured worker status through June 30, 2016. (Tr. at 15, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, July 15, 2011. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: degenerative joint disease of the left knee status-post ACL repair; status post facial fracture from ATV accident; borderline intellectual functioning; and anxiety disorder, NOS. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light work as defined in the regulations

> except he has a limited education. He could climb ladders, ropes, and scaffolds occasionally and could frequently perform other postural activities. He could have no concentrated exposure to extreme cold. He would be limited to one to two-step tasks in work requiring no public contact, and only occasional interaction with coworkers or supervisors. (Tr. at 19, Finding No. 5.)

At step four, the ALJ found that Claimant was unable to perform past relevant work. (Tr. at 27, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was thirty-two years old as of the onset date of disability, which is defined as a younger individual. (Id. at Finding No. 7.) The ALJ found that Claimant had a limited education, and could communicate in English. (Tr. at 28, Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national

economy that Claimant could perform. (Id. at Finding No. 9 and Finding No. 10.) On this basis, benefits were denied. (Tr. at 29, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on April 14, 1979, and was 35 years old at the time of the administrative hearing, June 17, 2014. (Tr. at 27.) Claimant has a limited education[2], and is able to communicate in English. (Tr. at 268.) He previously worked as a trash collector and provided lawn care for the

---

[2] Claimant indicated that he completed/quit school in the tenth grade and had been enrolled in special education classes. (Tr. at 42, 270.)

City of South Charleston. (Tr. at 21, 43.) He lives with his girlfriend, mother-in-law and minor son. (Tr. at 42.) He does not have a license to drive and must have someone drive him. (Tr. at 284.)

Per his Function Report dated May 27, 2012, Claimant can care for his hair, shave, feed himself, use the toilet, and shop for the household, although he is unable to pay bills, count change, handle a savings account or use a checkbook/money orders because he is "not good with numbers"; he needs assistance getting in and out of the bathtub and getting dressed because it hurts to stand. (Tr. at 282-284.) For hobbies, he watches television and spends time with his girlfriend; he does no household chores or yard work because his doctor "has me on bed rest." (Tr. at 283-284.) He does not go anywhere or enjoy having people around him because he never liked to socialize. (Tr. at 285-286.) He cannot pay attention long and cannot follow written instructions, but does "ok" with following spoken instructions. (Tr. at 286.) He could read more than his name. (Tr. at 268.) He uses a brace/splint and crutches anytime he walks. (Tr. at 287.)

The Medical/Educational Record

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments[3] and discusses it below.

Physical Impairments Records:

CAMC Urgent Care

In May and June 2011, Claimant was treated for a facial laceration and teeth fracture caused by a fall while riding his four-wheeler without a helmet when he hit his face on a rock. (Tr. at 329-331.) He underwent an open reduction of left orbital roof and rim fracture and debridement; two teeth were extracted. (Tr. at 330.)

---

[3] The undersigned gave extensive consideration of the records pertaining to Claimant's psychological/educational records as Claimant's issues on appeal only addresses his alleged intellectual or cognitive impairments.

On December 12, 2011, Claimant went to the urgent care center because he fell off his skateboard and hurt his right hand, an x-ray revealed plate and screws overlying the dorsal aspect of the shaft of the third metacarpal, but there was no evidence for acute fracture or dislocation. (Tr. at 323-324.)

On July 6, 2012, Claimant presented at the urgent care center with reports of knee pain after a twisting injury. (Tr. at 500-507, 549-550, 601-605.) X-rays revealed moderate joint effusion, but no other abnormalities. (Tr. at 505, 551, 617.)

<u>Teays Valley Orthopedic</u>

On February 23, 2012, Claimant saw Dr. David Felder, M.D. for an evaluation of his left knee injury. (Tr. at 456.) An MRI showed complete tear of the anterior cruciate ligament, medial collateral ligament sprain, bone marrow contusions of the tibial plateau and lateral femoral condyle, and joint effusion, described as an ACL rupture and slight MCL strain of the left knee. (Tr. at 465-466, 496-497.) Physical therapy was recommended in preparation for possible ACL reconstruction. (Tr. at 455.) A note dated March 22, 2012 indicated that Claimant had not started physical therapy. (Tr. at 454.) By April 2012, Claimant had attended some physical therapy sessions, and a left ACL reconstruction was planned. (Tr. at 453.) On May 7, 2012, Claimant underwent primary left ACL reconstruction followed by revision after failure of the femoral side of the graft. (Tr. at 472-473, 494-495.) By May 15, 2012, Claimant had no major complaints; x-rays indicated the graft was in good position and Claimant had full extension of his left knee on physical examination. (Tr. at 338-340, 452, 492-493.) Physical therapy was again prescribed. (Tr. at 452.)

Claimant reported to the emergency room on May 25, 2012 for staple removal and pain medication. A note dated May 29, 2012 indicated that Claimant had not gone to therapy due to having no transportation, and he complained of increasing discomfort, but no instability. (Tr. at 451.) A physical examination indicated that he lacked full extension by about 10 degrees, there was no giving way of the knee. (Id.) Continued physical therapy was advised. (Id.) An outpatient note dated June 14, 2012 indicated Claimant was late getting started for therapy due to transportation issues, but did not have a lot of discomfort in his left knee. (Tr. at 334.) Thrombophlebitis DVT in his left calf was negative per an ultrasound on June 15, 2012. (Tr. at 341, 459.)

Thomas Memorial Hospital

On January 24, 2012, Claimant received treatment for a laceration to his left hand: he was prescribed Bactrim and advised to use ice intermittently and limit use of his hand for nine days. (Tr. at 545-548.) On July 9, 2013, Claimant presented to the emergency department due to a laceration to his right hand he sustained in a fall at home (Tr. at 533-541.); x-rays revealed fixation plate and screw device from an old healed third metacarpal fracture; no new fracture was seen. (Tr. at 538.) Claimant was diagnosed with a "superficial laceration to right hand" and was advised to limit the use of his hand for seven days. (Tr. at 536.) Because he complained of pain in his left knee after his fall, an x-ray taken of his left knee demonstrated no acute fracture or dislocation, mild degree of osteoarthritis, and postsurgical changes after ACL reconstructive surgery. (Tr. at 540.)

The most recent records from February 2014 indicated that Claimant fell and complained of left knee pain with weight bearing; an examination revealed tenderness of the left knee with

mild swelling, range of motion was secondary to pain, x-rays revealed postsurgical changes, but no other specific pathology. (Tr. at 644-648.) He was diagnosed with left knee sprain and discharged home with a knee brace. (Tr. at 646.)

<u>State Agency Medical Consultant</u>

On August 2, 2012, Porfirio Pascasio, M.D., and on October 4, 2012, Dominic Gaziano, M.D., reviewed the evidence in connection with Claimant's initial application and request for reconsideration. (Tr. at 85-87, 99-100, 113-114, 125-126.) They provided a physical residual functional capacity assessment wherein Claimant could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk about six hours in an 8-hour workday, sit about six hours in an 8-hour workday, unlimited push/pull other than for lift/carry, occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl, and never climb ladders/ropes/scaffolds. The only other limitation was that Claimant should avoid concentrated exposure to hazards. The postural limitations were made due to Claimant's left ACL reconstruction. (Tr. at 86-87, 99-100, 113-114, 125-126.)

<u>State Agency Medical Examiner</u>

On December 9, 2013, Kip Beard, M.D. provided an internal medicine examination on Claimant. (Tr. at 582-593.) Claimant's chief complaint was left knee pain due to his four-wheeler accident in the summer of 2012. (Tr. at 582.) Dr. Beard noted Claimant reported being treated by Dr. Felder at Teays Valley and had last followed up with him a year prior. (<u>Id</u>.) Claimant reported his left knee hurt constantly, that it pops and grinds, making it difficult for him to "get up and down" and doing household chores. (<u>Id</u>.) Claimant reported intermittent right hand pain, as well as ongoing pain over the left orbit. (<u>Id</u>.) Claimant reported having hypertension, but never treated

for it. (Tr. at 583.) Dr. Beard reviewed Claimant's medical records from 2011 and July 2012 concerning Claimant's left knee surgery as well as an x-ray taken of the left knee in July 2012. (Tr. at 584.)

Dr. Beard observed Claimant had a mild left limp, but did not present with or require ambulatory aids. (Id.) He observed him to stand unassisted, arise from a seat and step up and down from the examination table without obvious difficulty. Dr. Beard observed Claimant seemed comfortable while seated and supine, could speak normally and could follow instructions without difficulty. (Id.) The physical examination revealed no abnormalities or limitations. (Tr. at 585-586.) With regard to Claimant's hands, Dr. Beard noted the right hand revealed some mild pain and some mild tenderness and slight swelling in the metacarpal regions, with reduced strength grip compared to the left hand, although Dr. Beard found Claimant was able to button and pick up coins with either hand and write with his dominant (right) hand without difficulty. (Tr. at 585.) Range of motion was normal. (Id.) Dr. Beard noted mild palpable effusion, and moderate pain with motion testing in the left knee, and intermittent patellofemoral crepitus; Claimant could flex his left knee to 135 degrees and extend it normally. (Id.) Claimant's right knee range of motion was normal with no complaints. (Id.) Dr. Beard observed Claimant could heel-walk, toe-walk, tandem walk, and was able to squat with knee pain. (Tr. at 586.)

Dr. Beard's impressions were Claimant had a complete left ACL tear, status post ACL repair with subsequent ACL repair and bone grafting; chronic left knee pain; right metacarpal fracture, status post open reduction and internal fixation with right hand pain and diminished grip strength; and left orbit fracture, status post open reduction and internal fixation with left orbit cephalgia. (Id.) Claimant was not hypertensive during examination, and no evidence of end-organ

12

damage related to hypertension. (Id.)

Dr. Beard provided a physical medical source statement with regard to Claimant's abilities to do work-related activities: notably, he found Claimant can frequently lift and carry up to 10 lbs., and occasionally lift and carry 11-20 lbs. (Tr. at 587.) Claimant could sit two hours without interruption, and stand and walk for one hour without interruption; he could sit four hours in an 8-hour workday and stand/walk for two hours in an 8-hour workday. (Tr. at 588.) Claimant does not require a cane to ambulate. (Id.) Dr. Beard found no restrictions regarding either of Claimant's use of his hands, and could continuously operate a foot control with his right foot, but never his left. (Tr. at 589.) Dr. Beard noted Claimant's postural activities thusly: frequently climb stairs and ramps, and stoop; occasionally climb ladders or scaffolds, kneel, and crouch; continuously balance; never crawl. (Tr. at 590.) His environmental limitations were limited to never being exposed to unprotected heights; frequent exposure to moving mechanical parts, operating a motor vehicle, and humidity and wetness; and occasional exposure to dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat and vibrations. (Tr. at 591.) No other limitations or restrictions were noted. (Tr. at 592.)

<u>Mental Impairments Records:</u>

<u>Kanawha County Schools</u>

Claimant's public school records indicate that he entered kindergarten in September 1984 and quit school during the 1994-1995 school year. (Tr. at 289-290.) Claimant began ninth grade in 1994. (Tr. at 290.) Claimant's math levels reveal he was performing at least one grade level below his peers by third grade (Id.); Claimant's reading levels demonstrate little to no growth in his reading abilities as a pre-reader from kindergarten to first grade, and his final reading levels in

second through fourth grade were significantly below grade level. (Id.) Interestingly, Claimant's records indicated that in the fourth grade, he earned B's in English, reading, spelling, and health, A's in writing and math, C's in science and social studies, and was satisfactory in music, art, and physical education. (Id.) The school records do not expressly indicate that Claimant was enrolled in special education; no other grades or marks are provided for Claimant's school years beyond the fourth grade.

Process Strategies

On October 23, 2013, Claimant presented to this outpatient clinic due to "suicidal thoughts." (Tr. at 571.) Claimant reported having no previous mental health evaluation or treatment. (Tr. at 572.) Claimant reported that he never held steady employment, was in special education, as well as a significant history of alcohol and drug abuse, including using Xanax on a daily basis, buying Lortab on the street to relieve his knee pain, and to using marijuana to calm his nerves. (Id.) Claimant reported having served jail time for domestic abuse convictions. (Id.)  Upon mental status examination, Claimant denied suicidal or homicidal ideation, exhibited normal speech, linear and goal directed stream of thought, and appeared alert to three spheres with "[n]o impairment in cognition or memory", however he was near tears in discussing the recent loss of his mother. (Tr. at 572-573.)  He was given a Global Assessment of Functioning (GAF) score of 50[4], prescribed medication, and referred for therapy. (Tr. at 573.) There is no documentation of follow-up treatment.

State Agency Psychological Consultant

---

[4] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

On August 2, 2012, Joseph A. Shaver, Ph.D., a state agency psychologist, and on September 8, 2012, James Binder, M.D., a state agency psychiatrist, reviewed the evidence in connection with Claimant's initial application and request for reconsideration. (Tr. at 82-84, 96-98, 111-112, 123-124.) They opined that Claimant had no severe mental impairment. (Tr. at 82-84, 96-98, 111-112, 123-124.) Dr. Shaver noted that Claimant's school records documented no testing, IEPs, or special education. (Tr. at 83, 96.)

State Agency Psychological Examiner

On July 10, 2012, Lisa C. Tate, M.A. evaluated Claimant and administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) and Wide Range Achievement Test – Fourth Revision (WRAT-4). (Tr. at 396-402.) Ms. Tate observed Claimant's grooming and personal hygiene were good; he walked slowly with a cane. (Tr. at 396.) Ms. Tate noted Claimant complained of having problems with his "nerves" and that he was nervous all the time. (Tr. at 397.) Claimant reported always having a learning disability, dropping out of the tenth grade and functioning on the seventh or eighth grade level. (Id.)  With regard to his mental status, he was oriented to person, place, time, and date; his mood depressed with affect restricted and slightly tearful. (Tr. at 398.) Ms. Tate observed Claimant's thought processes to be logical and coherent; fair insight; and fair judgment. (Id.) His immediate memory was within normal limits; recent memory was moderately deficient; and remote memory was within normal limits. (Id.) His concentration was mildly deficient (Id.), his persistence moderately deficient, and his pace within normal limits; his social functioning was within normal limits. (Tr. at 400.) Ms. Tate assessed Claimant's WAIS-IV scores and WRAT-4 results as being invalid based on his not establishing rapport, giving up easily, and requiring constant encouragement. (Tr. at 399.)

On November 26, 2013 Lisa C. Tate, M.A. provided another psychological evaluation of Claimant and administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) and the COGNISTAT. (Tr. at 574-581.) Ms. Tate observed Claimant's grooming and personal hygiene were good; he walked with a normal gait and maintained a normal posture, and appeared to have good use of all limbs. (Tr. at 574.) Ms. Tate noted Claimant reported having "bad nerves" and anxiety attacks two to three times a day. (Tr. at 575.) Claimant reported that he is uncomfortable around crowds. (Id.) He reported having a learning disability and dropped out of school in the tenth grade and was enrolled in special education classes. (Id.) He needed assistance reading his mail, but believed he could pay bills and manage finances. (Id.) He reporting having anger issues. (Id.) He reported being arrested for driving without a license. (Tr. at 576.)

With regard to his mental status, he was oriented to person, place, time, and date; his mood depressed with affect restricted and slightly tearful. (Id.) Ms. Tate observed Claimant's thought processes to be logical and coherent; fair insight; and judgment within normal limits. (Tr. at 576-577.) Ms. Tate observed Claimant's memory moderately deficient based on valid COGNISTAT scores, and his concentration was moderately deficient. (Tr. at 577-578.) Ms. Tate found Claimant's WAIS-IV scores valid, his full scale I.Q. was 70. (Tr. at 577.) She diagnosed Claimant with anxiety disorder, NOS and borderline intellectual functioning. (Tr. at 578.) Ms. Tate observed Claimant's social functioning, pace, and persistence within normal limits. (Tr. at 578-579.)

Ms. Tate provided a mental medical source statement of Claimant's ability to do work-related activities: Claimant had mild restrictions in his ability to understand and remember simple instructions; carry out simple instructions; and to make judgments on simple work-related decisions; she found Claimant had moderate limitations in his ability to understand and remember

complex instructions; carry out complex instructions and to make judgments on complex work-related decisions. (Tr. at 595.) Ms. Tate opined that Claimant had moderate restrictions in his interactions with the public, with supervisors, and with co-workers. (Tr. at 596.) She believed Claimant could manage benefits in his own interests. (Tr. at 597.)

The June 17, 2014 Supplemental Administrative Hearing

Claimant's Testimony

At the second administrative hearing, Claimant testified he lived with his girlfriend, son, and mother-in-law, and that his mother-in-law helped his girlfriend and him. (Tr. at 42.) He quit school in the tenth grade but was in the "slow learning classes" and performed on a seventh grade level. (Id.) Claimant stated that he quit school out of aggravation and feeling picked on because he was behind everybody; he never obtained a general education diploma. (Tr. at 42-43, 48.) He admitted his anger affected his personal relationships with family and friends and his ability to hold a job. (Tr. at 48-49.)

Claimant stated he could not work due to leg pain, anger issues, and being very emotional (Tr. at 49-53.) He last worked in 2011 at McDonald's but did not return after his four-wheeler accident. (Tr. at 43.) Previously, he had worked part-time for the City of South Charleston performing lawn care at a park. (Id.) He stated he had worked full-time at one point but was fired after an altercation with his uncle. (Tr. at 44.) Claimant testified that his father and two uncles also worked for the city, and that his father helped him get hired. (Id.) He stated he had anger problems in school too and did not like too many people being around him because it made him nervous. (Id.)

Claimant testified that after his four-wheeler accident, he had two total reconstruction

surgeries on his knee. (Tr. at 45.) He indicated he had plates in his knee and experienced pain, popping, and cracking when he walked. (Tr. at 45-46.) He stated his knee gave out on him "all the time," and he sometimes fell. (Tr. at 46.) Claimant stated he could stand for 15 to 20 minutes and must sit down slowly. (Id.) He stated that he also fractured the left side of his face in the four-wheeler accident, which cracked his skull, moved his left eye an inch and a half out of socket, broke his nose, ripped his lip off, and knocked his teeth out. (Tr. at 46-47.) Claimant testified to having migraines about every two or three days since the accident, for which he takes ibuprofen 800s. (Tr. at 47.) He also described previous injuries to his hands that were unrelated to the accident but limited his ability to grip and to lift more than 20 to 25 pounds with both hands. (Tr. at 47-48.)

George S. Bell, M.D., Medical Expert

Dr. Bell confirmed he was a specialist in psychiatry and neurology, and had reviewed Exhibits 1F through 15F, and had enough information to render an opinion. (Tr. at 53-54.) Dr. Bell testified that Claimant met Listing 12.05C as a result of valid I.Q. testing and marked or extreme limitations in social functioning. (Tr. at 54-55, 58.) Dr. Bell stated Claimant's record demonstrated deficits in adaptive functioning due to severe difficulties with anger and impulsiveness, to his inability to cope with structure and supervision of a job in order to maintain steady employment, even in a sheltered environment, and to his significant difficulties in school. (Tr. at 55-57.) Dr. Bell testified that Claimant's I.Q. profile did not look like it was secondary to a recent brain injury; that it appeared to have been the case all along. (Tr. at 58-59.) Dr. Bell further stated that Claimant's 2012 I.Q. and achievement scores, which were considered invalid because he gave up easily and required constant encouragement, were internally consistent with his scores in reading, spelling, and math because they "were fairly close to each other" without "a wide variation" or a

18

random pattern that would have suggested he was malingering or faking his abilities. (Tr. at 59-60.) Dr. Bell opined that Claimant's intelligence and achievement profile indicated the tests were hard for him and he "just sort of gave up easily." (Tr. at 60.)

Owen J. Dodd, Vocational Expert

The VE testified Claimant had only one job of any significant length, which was as a city trash collector performed at the unskilled, very heavy level. (Tr. at 61.) The ALJ agreed this position was the only job to consider. (Tr. at 64.) The ALJ then asked the VE to consider a hypothetical individual with Claimant's vocational profile and controlling RFC; the VE responded that the individual would be unable to perform Claimant's past work but could perform other work at the unskilled, light level. (Tr. at 64-65.) With the additional need to alternate between sitting and standing every 30 minutes, the VE stated jobs would remain available at the light level, however, if assuming that such an individual would be expected to have weekly verbal altercations with a coworker and supervisor, the VE explained this could result in termination depending on the tolerance of the management. (Tr. at 65-66.)

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the ALJ's determination that he did not meet 12.05C Listings was not based on substantial evidence, and that he improperly evaluated the opinion of Dr. George S. Bell pursuant to the Regulations. (Document No. 11 at 6-20.)

Claimant contends that he "is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (citing Bowen v. City of New York, 476 U.S. 467, 471, 106 S. Ct. 2022, 90 L. Ed. 2d 462 (1986)). (Id. at 7.) To meet or equal Subsection C of Listing § 12.05, a claimant

is required to provide evidence proving: (1) an I.Q. score between 60 and 70, (2) significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation. See 20 C.F.R. pt. 404, subpt P, app. 1, §§ 12.00, 12.05. Claimant argues Dr. Bell's testimony supports that he met Listing 12.05C. (Id. at 8.) The ALJ rejected Dr. Bell's opinion, however, the ALJ acknowledged that Claimant's I.Q. scores ranging from 63 to 79 and a full-scale I.Q. score of 70 were valid, an opinion shared by the examining psychologist, Ms. Tate. (Id. at 9.) Claimant contends that pursuant to Luckey v. U.S. Dept. of Health and Human Servs., 890 F.2d 666 (4th Cir.1989), the Court may presume a claimant's I.Q. prior to age 22 has remained the same or approximately the same as that revealed in testing administered in connection with the disability application as long as there is no evidence to indicate a change in intellectual functioning. (Id.) The ALJ questioned if Claimant's I.Q. was the same prior to age 22, despite the lack of evidence to suggest that his intellectual functioning changed as a result of his four-wheeler accident. (Id. at 9-10.) Claimant points to the testimony of Dr. Bell in support of this contention:

> Apparently, from [what] I've seen, he had significant head injury, but I don't think that that's the basis of the - - of the IQ. I actually work here at Moore's (phonetic) Hospital in Philadelphia, which is one of the ten top brain injury hospitals in the country. We see a lot of these cases. And this - - his profile does not look like it's secondary to a recent brain injury. It looks like - - more like this has been the case all along.

(Id. at 10.) Claimant argues that the ALJ gave this opinion "no weight" and instead impermissibly[5] supplied his own unsupported opinion that Claimant's "cognitive level was established after he reached the age of 22 as the head injury could be a factor." (Id.) Claimant contends there was no

---

[5] Grimmett v. Heckler, 607 F. Supp. 502, 503 (S.D.W.Va. 1985) (citing Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

other evidence that suggested Claimant's intellectual functioning was affected by his four-wheeler accident, and even the ALJ's finding he had no other severe impairment as a result underscores the argument that the ALJ's determination otherwise lacked evidentiary support, and that Claimant's I.Q. scores could have been presumed the same prior to age 22. (Id. at 11-12.)

Claimant also argues that the ALJ's findings that he did not exhibit adaptive functioning deficits were unfounded because his educational records showed that he repeated a grade and was performing a grade below his peers. (Id. at 12-13.) Claimant's WRAT-4 results were corroborated by his educational records, were not the product of faking or malingering, further proving that deficits in his intellectual functioning and adaptive functioning were consistent prior to age 22. (Id. at 13-14.) Claimant also points out that the ALJ's finding of his daily activities, which were repetitive and familiar, as evidence of no significant deficits in functioning is actually indicative of those suffering from intellectual disabilities pursuant to the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"):

> During their adult years they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in a supervised setting.

(Id. at 14.) Further, Claimant argues that the ALJ ignored evidence that he could not live independently and needed his mother's assistance to fill out his disability forms, as well as Dr. Bell's testimony that Claimant had marked limitations in social functioning. (Id. at 14-15.)

Claimant also argues that the ALJ's finding that his work history provided evidence that he lacked significant deficits in adaptive functioning is counter to the holding in Luckey, and ignores the fact that only two of his eight years of employment with the City of South Charleston rose to

substantial gainful activity and had been "sheltered" employment due to the fact that his employment was the result of having help from his father and uncles. (Id. at 15-16.)

Claimant contends that the evidence proved that he met the requirements under Listing 12.05C, thus entitling him to benefits. (Id. at 16-17.) Claimant points out that Dr. Bell testified that his impairments "meets the listing, actually, 12.05" and explained that Claimant's 2013 I.Q. tests were a valid reflection of his cognitive functioning prior to age 22 as well as cited to evidence in the record that demonstrated Claimant's deficits in adaptive functioning prior to age 22 in satisfaction of the listing requirements. (Id. at 18.) Claimant argues that the ALJ's rejection of Dr. Bell's opinion as being "wholly inconsistent with the actual evidence of record" was in contravention to the factors under 20 C.F.R §§ 404.1527, 416.927 for evaluating medical opinions; the ALJ's rejection of this opinion was further based upon a flawed analysis of Claimant's credibility. (Id. at 18-19.) Claimant further argues that this error is reified by the ALJ's failure to cite to any medical evidence in support of his finding that Dr. Bell's opinion was inconsistent with the record, when there were no competing medical opinions supporting the ALJ's contrary lay opinion. (Id. at 19.)

The Commissioner responds that Claimant did not meet the Listing criteria of 12.05C, that the ALJ properly evaluated the opinion of Dr. Bell, and that the decision is supported by substantial evidence. (Document No. 14 at 7-13.) The Commissioner argues that pursuant to 20 C.F.R. §§ 404.1525(a), 416.925(a) and Sullivan v. Zebley, 493 U.S. 521, 530 (1990), Claimant had to prove he met all criteria of Listing 12.05C, and in this case, he did not meet the diagnostic criteria that requires significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested prior to age 22. (Id. at 8.) The Commissioner argues that "[d]eficits

in adaptive functioning refer to 'adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Gibson v. Astrue, No. 5:11-374, 2012 WL 3985196, at *9 (S.D.W. Va. Sept. 11, 2012) (quoting 20 C.F.R. pt. 404. supt. P, app. 1, § 12.00(C)(1)). (Id.)

The Commissioner contends that the evidence showed that Claimant could care for his personal needs, prepare his own meals, pay bills, take public transportation, manage his finances, and shop; there was no evidence that he had adaptive functioning deficits prior to age 22, as there was no evidence that he was enrolled in special education despite his allegations otherwise. (Id.)

The Commissioner further argues that Ms. Tate assessed Claimant with only borderline intellectual functioning which "[b]y definition, an individual with borderline functioning [does] not have deficits in adaptive functioning manifested during the development period."   Carter v. Astrue, No. 08-37, 2009 WL 2750987, at *3 (M.D. Ga. Aug. 26, 2009); see also Gibson, 2012 WL 3985196, at *8-9 (noting that an examiner's finding of borderline intellectual functioning further demonstrated that plaintiff did not demonstrate deficits in adaptive functioning before age 22). (Id. at 9.)

The Commissioner argues that Claimant is asking the Court to re-weigh the conflicting evidence, a duty of the ALJ. Hancock v. Astrue, 667 F.3d 470, 476 (4th Cir. 2012). (Id. at 10.)  The Commissioner contends that Dr. Bell did not examine Claimant, but opined that he had deficits in adaptive functioning, which the ALJ properly found that Dr. Bell relied heavily on Claimant's self-reports that were not documented in the record: his allegations of special education, legal entanglements, episodes of anger and violence, and conflicting reports of drug and alcohol abuse.

(Id.) Per Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996), the Commissioner does not have to adopt an opinion based on a claimant's subjective complaints. (Id.) The Commissioner points out that the Regulations allow an ALJ to assign less weight to opinions that are unsupported by or inconsistent with the evidence, and further, an opinion that an impairment meets a Listing is not an opinion. 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4); 20 C.F.R. §§ 404.1527(d), 416.927(d). (Id. at 10-11.)

The Commissioner also argues that Claimant's argument that a person's I.Q. is presumed to be the same throughout one's lifetime and reliance on Luckey v. U.S. Department of Health and Human Services, 890 F.2d 666 (4th Cir. 1989) is misplaced because Claimant still must meet the diagnostic criterion under 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A, and the evidence indicated that he had not. (Id. at 11.) Further, the Commissioner argues that the ALJ properly found that Claimant did not have adaptive functioning deficits, as his work history and other activities supported such a determination. (Id. at 12.)

Claimant replies that the Court should recognize that substantial evidence supported a prima facie case of disability at step three based on the uncontroverted medical opinion evidence from the Commissioner's own psychological expert, which the ALJ rejected and replaced with his own lay opinion. (Document No. 15 at 1.) Claimant further argues that the Commissioner did not address the ALJ's factually incorrect determination that the evidence was void of adaptive deficits prior to age 22 when Claimant's educational records show that he repeated a grade had deficiencies in math and reading during a developmental age. (Id. at 2.) Claimant contends that the Commissioner ignores her own Regulations that an adjudicator must apply the applicable factors in 20 CFR §§ 404.1527(d) and 416.927(d) regarding the evaluation of medical opinion evidence.

(Id. at 3.) Claimant asks the Court to reverse the ALJ's decision and remand for an award benefits, or in the alternative, for the ALJ to correct the errors made below. (Id.)

Analysis

Claimant's appeal concerns whether the ALJ appropriately evaluated the opinion evidence of record in determining that Claimant satisfied the criteria of Listing 12.05C at step two of the sequential evaluation process as dictated by 20 C.F.R. §§ 404.1520(d), 416.920(d); specifically, Claimant claims the ALJ erred in affording no weight to the opinion of Dr. George S. Bell, who testified that Claimant did meet the criteria of Listing 12.05C at the administrative hearing.

In order to meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. In addition, Section 12.05C of the Listing of Impairments provides that Claimant must show "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)."

The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of § 12.05C. Luckey v. Bowen, 890 F.2d 666 (4th Cir. 1989). A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c) (2015); see also, Petry v. Colvin, 2015 WL 5786769, at *6 (S.D.W. Va. Sept 30, 2015).

Starting with Claimant's physical impairments, the ALJ found Claimant to have two severe physical impairments: degenerative joint disease of the left knee status-post ACL repair, and status post facial fracture from ATV accident. (Tr. at 15.) With regard to Claimant's left knee, the ALJ

specifically found that the impairment failed to satisfy listing 1.02 because the record contained no evidence supporting the necessary findings thereunder.[6] (Tr. at 16-17.) With regard to Claimant's facial fracture, the ALJ noted that it was documented in the record, and that Claimant alleged some headaches, however, the ALJ expressly found that the evidence in the record did not meet the listings under 1.00, 2.00, and 11.00. (Tr. at 17, 22-23.)

With regard to Claimant's severe mental impairments, the ALJ found two: borderline intellectual functioning and anxiety disorder, NOS. (Tr. at 15.) However, the ALJ found that neither mental impairment, singly or in combination met the criteria of listings 12.04, 12.05, and 12.06. (Tr. at 17.) Further, the ALJ found that the lack of ongoing treatment for Claimant's anxiety disorder diminished his credibility with regard to his mental health complaints.[7] (Tr. at 24.) The ALJ found that the criteria of Listing 12.05C was not supported by the evidence: though Claimant does have IQ scores falling in the 60 through 70 range, the ALJ found that the record failed to establish any such mental and/or cognitive limitations began prior to age 22. (Tr. at 18-19.) Specifically, the ALJ found that Claimant's educational records revealed he attended school through the 9th grade, and "generally enrolled in grade-level classes." (Tr. at 19.) Further, the ALJ noted the lack of evidence of special education testing placement. (Id.) The ALJ also noted that Claimant had a history of a head injury, and opined that it "makes it more likely that he [sic] his current baseline cognitive level was established after he reached the age of 22 as the head injury could be a factor." (Id.) The ALJ did not find that Claimant had adaptive functioning deficits that

---

[6] Because the physical impairments are ostensibly uncontested as they were not pertinent to this appeal, the undersigned only briefly addresses them; the gravamen of the arguments concern Claimant's I.Q. and intellectual functioning level prior to age 22.

[7] Claimant does not address the ALJ's findings with regard to anxiety disorder, however, as it was noted to be a severe mental impairment and as such can establish one of the criterion pursuant to Listing 12.05C, it is addressed herein briefly.

met Listing 12.05C, because Claimant had a significant work history and could prepare simple meals and pay bills. (Id.)

The ALJ afforded "great weight" to Ms. Lisa Tate's opinion, "[s]he supported her findings with explanation and they are consistent with her own evaluation notes." (Tr. at 26.) The ALJ noted that Ms. Tate "found the claimant would be able to function satisfactorily, but would have more than a slight limitation in the ability to understand, remember and carry out complex instructions, and the ability to make judgments on complex work-related decisions." (Id.) Ms. Tate evaluated Claimant twice for purposes of disability evaluation, and during her second evaluation on December 3, 2013, she noted that Claimant "identified continued issues with 'bad nerves'" and reported having anxiety attacks 2 to 3 times daily. (Tr. at 24.) With regard to Claimant's intellectual functioning, Claimant reported that he had a learning disability: he was enrolled in Special Education courses; he repeated grades 6 and 8; he was unable to read and write well enough to complete a job application; and he needed assistance reading his mail. (Id.) Ms. Tate re-administered an I.Q. test, and determined that Claimant's full scale I.Q. of 70 was a valid result. (Id.) She diagnosed Claimant with anxiety disorder, NOS and borderline intellectual functioning. (Id.)

The ALJ gave no weight[8] to Dr. George Bell's opinion that Claimant met Listing 12.05C. (Tr. at 26-27.) The ALJ noted that Dr. Bell referred to Claimant's valid I.Q. of 70, as administered by Ms. Tate, and referred to Claimant's self-reports of severe anger and lack of employment. (Tr. at 26.) Dr. Bell described Claimant's employment with the City of South Charleston as "sheltered" due to Claimant's report that he got the job through family members. (Id.) The ALJ noted that Dr.

---

[8] The ALJ also gave no weight to the State agency psychological consultants, Drs. Shaver and Binder, due to not being privy to the valid I.Q. testing provided by Ms. Tate. (Tr. at 26.)

Bell opined that Claimant's intellectual issues were lifelong, having been present prior to age 22, due to Claimant's history of special education and school difficulties. (Tr. at 27.) It was further noted that Dr. Bell opined that Claimant's I.Q. profile was not secondary to a brain injury, but had been present prior to the alleged onset date. (Id.) The ALJ found Dr. Bell's opinion "wholly inconsistent with the actual evidence of record", and provided the following explanation: Dr. Bell drew heavily from Claimant's self-reports, particularly those involving episodes of anger, violence and legal entanglements were undocumented or alleged elsewhere in the record; Claimant denied any drug and alcohol abuse to Ms. Tate; there was no compelling evidence that Claimant's intellectual capacity was present prior to age 22; educational records identify no special education, psychological or intelligence testing, or history of disruptive behavior; Claimant had a longitudinal history of employment with the City of South Charleston[9], albeit unskilled work; and Claimant was able to care for his own personal needs. (Id.) Moreover, the ALJ found Claimant's alleged limitations as a result of his mental impairments not entirely credible. (Tr. at 20.) Claimant's participation in activities of daily living included using public transportation, spending time with his girlfriend, visiting a convenience store regularly, visiting his father twice a week, visiting his stepmother twice per month, and going to the grocery store once per month; the ALJ found these activities indicated moderate limitations in social functioning.[10] (Tr. at 24.)

The undersigned **FINDS** that there is no evidence in the record, particularly expert opinion evidence, that suggested Claimant's intellectual functioning was affected by any head injury as

---

[9] The ALJ considered Claimant's work history in assessing his credibility; though he had limited earnings, his nearly eight years of employment with the City weakens his allegations of severe intellectual deficiencies. (Tr. at 25.)
[10] The ALJ also found Claimant's allegation that he just watched television all day weak evidence in favor of finding him disabled because it could not be objectively verified and was difficult to attribute to a medical condition based on the weak medical evidence, among other factors. (Tr. at 24-25.)

suggested by the ALJ. On that note, the undersigned agrees with Claimant that this is an unfounded lay opinion by the ALJ in the spirit of <u>Grimmett v. Heckler</u>, 607 F. Supp. 502, 503 (S.D.W.Va. 1985) (citing <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Given that blatant error, the remainder of the ALJ's analysis, particularly with regard to Dr. Bell's opinion testimony, gives the undersigned pause insofar as the ALJ found no "compelling evidence that Claimant's intellectual capacity was present before he reached the age of 22." (Tr. at 27.) Having reviewed all the evidence of record, the undersigned **FINDS** no evidence indicated otherwise. As mentioned supra, the ALJ explained that the educational records and employment history supported his conclusions regarding Claimant's intellectual impairment, however, even given the rather stark educational records, it defies logic that Claimant achieved A's and B's in subjects that were below his stated grade level. (Tr. at 290.) Also, there was no evidence in the record that countered Claimant's allegations that he got his city job through family members; there is no other evidence that rebutted Dr. Bell's description of that job as "sheltered." Those reasons did little to justify the finding that Claimant lacked adaptive functioning deficits as defined in the Regulations. Moreover, according to the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 5th Edition, (DSM-V) (2013), one of the essential features of intellectual disability is impairment in everyday adaptive functioning. <u>Id</u>. at 37-41. Adaptive functioning refers to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. <u>Id</u>. at 37.

An ALJ has a duty to identify the relevant listed impairments and compare each of the listed criteria to the evidence of a claimant's symptoms. <u>See</u>, <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986). Without a sufficient explanation, a reviewing court has to guess the ALJ's

reasoning behind his findings, rendering determination that there was substantial evidence to support the decision impossible. The record does not reflect that the ALJ performed a proper adaptive functioning analysis contemplated by Listing 12.05C, indeed, it appears that such analysis was discarded after the summary finding that Claimant exhibited no intellectual disability prior to the age of 22, despite no evidence supporting that finding. Accordingly, the ALJ's decision is not supported by substantial evidence and remand is necessary in order for the ALJ to perform the requisite adaptive functioning analysis in further consideration of Listing 12.05C.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 20, 2016.

Omar J. Aboulhosn
United States Magistrate Judge